FILED

09/12/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs August 7, 2018

**STATE OF TENNESSEE v. WILLIE MITCHELL**

**Appeal from the Criminal Court for Shelby County**
**No. 17-00856      Lee V. Coffee, Judge**

_____

**No. W2018-00101-CCA-R3-CD**

_____

Following a trial, a Shelby County jury found Defendant, Willie Mitchell, guilty of aggravated robbery and aggravated burglary. The trial court sentenced Defendant, as a career offender, to a total effective sentence of forty-five years in the Tennessee Department of Correction. On appeal, Defendant challenges both the sufficiency of the evidence as it relates to his conviction for aggravated robbery and the sentence imposed by the trial court. Following a thorough review, we affirm the judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

Jessica L. Gillentine (on appeal), Bartlett, Tennessee; and Charles E. Waldman (at trial), Memphis, Tennessee, for the appellant, Willie Mitchell.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Background**

*Procedural history*

In February 2017, the Shelby County Grand Jury indicted Defendant for the following offenses:

| Count | Offense | Classification | Victim |
|-------|---------|----------------|--------|
| 1 | Especially aggravated kidnapping | Class A felony | Whitney Webb |
| 2 | Especially aggravated kidnapping | Class A felony | Melody Lee |
| 3 | Especially aggravated kidnapping | Class A felony | Stacy Burns |
| 4 | Aggravated robbery | Class B felony | Whitney Webb |
| 5 | Aggravated kidnapping | Class B felony | Whitney Webb |
| 6 | Aggravated kidnapping | Class B felony | Melody Lee |
| 7 | Aggravated kidnapping | Class B felony | Stacy Burns |
| 8 | Aggravated burglary | Class C felony | Whitney Webb |
| 9 | Employing a firearm in commission of a dangerous felony | Class C felony | N/A |
| 10 | Convicted felon in possession of a firearm | Class B felony | N/A |

Following a jury trial, Defendant was found guilty of aggravated robbery, in Count 4, and aggravated burglary, in Count 8. Defendant was acquitted of all other charges. The trial court sentenced Defendant, as a career offender, to thirty years for aggravated robbery and fifteen years for aggravated burglary and ordered Defendant's sentences to run consecutively for a total effective sentence of forty-five years' incarceration.

Defendant filed a timely motion for new trial, which was denied after a hearing. This timely appeal follows.

*Trial testimony*

Sixty-two-year-old Whitney Webb testified that he lived in an apartment on Kansas Street with his girlfriend, Melody Lee, in January 2015. Mr. Webb explained that Stacey Burns, the mother of Ms. Lee's grandson, was staying at their apartment for "a few nights" leading up to January 29, 2015. On that morning, Mr. Webb drove Ms. Burns and Ms. Lee to a methadone clinic so that they could pick up medication. Mr. Webb testified that his utilities had been turned off due to non-payment but that he received a telephone call from someone claiming to be with Memphis Light, Gas and Water ("the utility company") while on the way home. The caller stated he would meet Mr. Webb at his apartment to restore the utilities. When Mr. Webb arrived at the apartment, he saw a brown van parked on the side of the road, which he recognized as belonging to Defendant, whom he knew as "Naji."

Mr. Webb went inside the apartment with Ms. Lee and Ms. Burns. Moments later, there was a knock on the kitchen door. When Ms. Lee answered the door, Mr. Webb saw a gun "jamming the door[.]" Mr. Webb testified that the weapon appeared to be a shotgun, and it scared him. Two men then pushed their way into the apartment and began

- 2 -

"scuffling" with Mr. Webb in the living room. He recalled that one of the men was a white male and the other a black male. The white male carried the shotgun, and the black male wore a mask; however, Mr. Webb noticed gold teeth in the man's mouth, which caused him to believe that the assailant was Defendant. Mr. Webb pulled off the black male's mask and "knew for sure it was [Defendant]." Defendant hit Mr. Webb repeatedly with his fist, while the white male tied up Ms. Lee and Ms. Burns. Defendant then knocked Mr. Webb to the ground, put him "in some kind of a lock," and told the white male to take Mr. Webb's wallet. After taking Mr. Webb's wallet, which contained $2,000 from a settlement in a lawsuit, the assailants ran out of the apartment. Mr. Webb then untied Ms. Lee and Ms. Burns, and they called 911.

Mr. Webb testified that he was acquainted with Defendant and that Defendant cut his hair one time. He testified that he did not give Defendant or the white male permission to enter his residence and take his property. Mr. Webb recalled that he sustained a "busted nose" during the assault. He stated that the assailants took the shotgun with them, but Defendant left behind the mask and a jacket. Mr. Webb's wallet was later found empty somewhere in the apartment complex. Mr. Webb testified that during the police investigation, he identified Defendant in a photographic lineup. He stated that Defendant was "coaching the white man" during the robbery.

On cross-examination, Mr. Webb testified that he took medication for paranoid schizophrenia on the morning of the offense. He agreed that his medication could cause side effects, which included Mr. Webb's hearing voices and music, jerking in his sleep, and walking like he was "crazy." However, Mr. Webb stated that he did not have any hallucinations the day of the offense, and he did not take any other drugs. Mr. Webb also testified that he took a BB gun out of his bedroom after the assailants left because he wanted something to protect himself with, "in case they came back." Mr. Webb agreed that, in his initial statement to police, he said that his wallet had contained $1,000.

Melody Lee and Stacey Burns testified that they were living at Mr. Webb's apartment in January 2015 and that the utilities were cut off on January 28. The following day, Mr. Webb took Ms. Lee and Ms. Burns to the methadone clinic and then to a pawn shop to purchase a microwave. Before leaving to go to the clinic, Ms. Lee called the utility company. She also received a telephone call from Defendant, who asked to borrow money from her. On the ride back to the apartment, they received a telephone call from someone claiming to work for the utility company, who said that he was on his way to the apartment.

Upon returning to the apartment, Ms. Burns and Ms. Lee were cleaning the kitchen when there was a knock at the door. Ms. Lee looked through the peephole and saw a white male, who identified himself as an employee of the utility company. When

Ms. Lee opened the door, two men armed with guns came into the apartment. The white male tied up Ms. Burns with a telephone cord in the kitchen and held the gun behind her head. The second man, who wore a mask, tied up Ms. Lee in the bedroom. Both women then heard "tussling" in the living room. Ms. Burns testified that "[i]t sounded like [Mr. Webb] was getting beat up[.]" Ms. Lee heard the assailant demand Mr. Webb's wallet. The two assailants then ran out of the apartment, and Ms. Burns testified that they left with the guns they brought into the residence. After Ms. Lee and Ms. Burns were untied, they locked the front door and called the police. Ms. Lee testified that Mr. Webb went into the bedroom and grabbed a BB gun, which he kept in the corner of the room. She also explained that she received five thousand dollars in an insurance settlement and gave Mr. Webb between $2,200 and $2,500 a few days before the incident.

Frank Nelson testified that he lived in the same apartment complex as Mr. Webb. Mr. Nelson recalled that, on the afternoon of January 29, 2015, he was about to get in his truck to go to a store when he noticed a burgundy van parked at the end of the street. Mr. Nelson then saw two men—a black male and a white male—run out of Mr. Webb's apartment in separate directions. The black male was wearing a mask, and the white male appeared to be carrying something under a jacket. He recalled that, by the time he left his driveway, the burgundy van was gone.

Officer Glen Teal of the Memphis Police Department testified that he responded to Mr. Webb's apartment around 1:30 p.m. Upon arrival, Officer Teal brought the victims outside to speak with them. He recalled that one woman was "a little hysterical" and speaking quickly. Mr. Webb was holding his head because of an injury he received during the robbery. Mr. Webb told Officer Teal that the assailants stole a set of keys and a wallet, containing over $1,000. Officer Teal secured the scene and called for a crime scene investigator.

Officer Steven Ford, a crime scene investigator with the Memphis Police Department, testified that he processed the scene at Mr. Webb's apartment on the afternoon of January 29, 2015. When he arrived at the scene, Officer Ford spoke to the victims, who were "upset" and "nervous." Officer Ford noted that it looked like Mr. Webb had been hit in the face and that the victims did not appear to be under the influence of drugs or alcohol. Officer Ford photographed the scene of the apartment complex. He recovered a "makeshift mask" worn by one of the assailants hanging on a clothesline outside. Officer Ford explained that the mask was actually a scarf with two holes in it. Inside Mr. Webb's apartment, he recovered a telephone cord used to bind the victims. Additionally, the victims pointed out a black and red Buccaneer jacket that had been left in the apartment by one of the assailants, and Officer Ford collected the jacket as evidence. Officer Ford testified that the only weapon found inside the residence was a

BB gun, which belonged to Mr. Webb. Officer Ford recalled that the BB gun was found in the kitchen, and he returned the weapon to Mr. Webb.

Detective Brandon Hudson of the Memphis Police Department testified that he was assigned to investigate the home invasion robbery that occurred at Mr. Webb's apartment. When he was given the case file, Detective Hudson learned that one of the assailants went by the nickname Naji. During his investigation, Detective Hudson received information from a fellow officer who identified Defendant as Naji and said that Defendant drove a burgundy minivan. Detective Hudson prepared a photographic lineup using Defendant's driver's license photograph, and Mr. Webb identified Defendant in the lineup.

Defendant was arrested on February 9, 2015. After being read his *Miranda* rights, Defendant agreed to provide Detective Hudson a statement. Defendant told Detective Hudson that he was aware of the home invasion robbery that occurred at the apartment on Kansas Street. Defendant admitted that he participated in the robbery but denied that he and his accomplice used guns in the offense. Defendant stated that he wore "all black clothes" and "a blue, white, and gray mask," and he "struggle[ed]" with Mr. Webb during the robbery. When asked if his mask came off at any time during the robbery, Defendant responded, "No but [Mr. Webb] pulled the eyes. That's when he probably saw it was me." He stated that he threw the mask outside as he was leaving Mr. Webb's apartment. Defendant told Detective Hudson that he drove a red Dodge minivan and admitted that he drove the vehicle that day. Defendant explained that he knew Mr. Webb, and he robbed Mr. Webb because Mr. Webb owed him $137. Defendant described his accomplice as a white male named "Billy," who wore a blue jacket with a hood and some blue jeans during the robbery. While Defendant held down Mr. Webb, Billy took Mr. Webb's wallet, which contained $300 to $400. Defendant said that he split the money with Billy. Defendant told Detective Hudson that Billy called Mr. Webb pretending to be with the utility company, and they parked in a nearby driveway waiting for the victims to enter the apartment. Then, Billy pretended to be with the utility company to gain entry into the apartment. Defendant said that Billy tied up one of the female victims with a white telephone cord and demanded money. Defendant began "tussling" with Mr. Webb to get him on the floor. Defendant stated that he was "trying to make [Mr. Webb] put his hands behind his back so [Defendant] could tie him up as well." Billy then removed Mr. Webb's wallet, and they fled the scene in Defendant's van. Defendant denied taking anything from Ms. Lee or Ms. Burns. Regarding the use of a weapon during the robbery, Defendant stated, "We didn't have any weapons. It was a BB gun in the house that Billy picked up. He wrapped a red coat around the BB gun, and pointed it at [Mr. Webb] as I rushed him."

Willie Robinson testified on behalf of Defendant. Mr. Robinson testified that he was a mechanic and owner of Precise Automotive. Mr. Robinson identified a photograph of a Chrysler minivan, which he stated belonged to Defendant. Mr. Robinson stated that his son had been in a minor car accident in January 2015 and that Defendant's van had been in his shop from the day before the accident until the late evening hours of the day of the accident. However, Mr. Robinson testified that he could not recall the date of his son's car accident and was unsure of the dates that Defendant's van was in his shop. Mr. Robinson testified, "I don't exactly know what date. I can't pinpoint it because it's been a couple of years."

Based on this proof, the jury convicted Defendant of aggravated robbery and aggravated burglary.

*Sentencing hearing*

At a sentencing hearing, the State introduced, without objection, Defendant's presentence report and certified copies of Defendant's prior convictions. No further proof was presented. Following arguments of counsel, the trial court determined that Defendant was a career offender based on his prior twelve convictions for aggravated robbery, one conviction for attempted first-degree murder, and four convictions for aggravated kidnapping. Accordingly, the trial court sentenced Defendant, as a career offender, to thirty years with a hundred percent (100%) release eligibility for aggravated robbery. The court further sentenced Defendant, as a career offender, to fifteen years with a sixty percent (60%) release eligibility for his conviction of aggravated burglary.

The trial court then made additional findings "in the event the Court of Criminal Appeals concludes that [Defendant] is not a career offender[.]" Specifically, the trial court stated:

I do find that [Defendant] does have a previous history of criminal convictions or criminal behavior in addition to those necessary to establish his appropriate range.

And, again, he has seventeen felony convictions on his record. And, apparently, once he got out of prison, [Defendant] did not commit any other crimes. He had a really, really, really, really bad year in 1996 when he was arrested for and convicted of seventeen separate felony convictions, and other -- and that's a big "other."

Other than those convictions, the only other arrest he has on his history is a first-degree murder out of Arkansas, for which the presentence

- 6 -

report indicates there is no disposition attainable, at the age of seventeen. But he does have a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range.

He, in fact, was a leader in the commission of this offense involving two or more people. There is also a person who has not been identified. The police put together photospreads, tried to locate the white male that was involved with this home invasion robbery with [Defendant], and that person still has yet to be identified. And the Court does, in fact, find that [Defendant] was a leader in the commission of the crime.

This Court also finds that all the other possible enhancement factors would, in fact, be implicit in the conduct for which the Defendant has been convicted, with the exception of the aggravated burglary. And, on the aggravated burglary, I do find by a preponderance of the evidence that the Defendant did, in fact, possess or employ a firearm in the commission of the aggravated burglary. And I give all those findings great, significant, extreme weight . . . .

Regarding sentence alignment, the trial court found that Defendant's record of criminal activity was extensive. Additionally, the trial court determined that Defendant was a dangerous offender whose behavior indicated little or no regard for human life and that Defendant had no hesitation about committing a crime in which the risk to human life is high. The trial court found that the facts and circumstances of the case were aggravated and that the aggregate length of Defendant's sentences was reasonably related to the severity of the offenses for which he was convicted. The court determined that "consecutive sentences . . . [were] necessary to protect this community from further acts of violence by this Defendant." Based on these findings, the trial court ordered Defendant's sentences to run consecutively for to a total effective sentence of forty-five years in the Tennessee Department of Correction.

## II. Analysis

### A. Sufficiency of the evidence

Defendant contends that the evidence presented at trial was insufficient to support his conviction for aggravated robbery. He argues that there was no evidence that pointed to him "ever employing a weapon, real or fake" and that the victims' testimony "consistently put the gun in the hands of the white male." Moreover, in his statement to police, Defendant stated that neither he nor his accomplice had a weapon and that his accomplice instead used a BB gun found in the apartment. Defendant also contends that

because the jury found him not guilty in Counts 9 and 10 of employing a firearm in commission of a dangerous felony and convicted felon in possession of a firearm, it rejected the premise that Defendant was armed. He argues that this court should reduce his conviction to the lesser-included offense of robbery due to this inconsistency. The State responds that, when viewed in the light most favorable to the State, the evidence was "more than sufficient" to support the guilty verdict for aggravated robbery.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

"Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2015). As charged in Count 4, aggravated robbery is a robbery that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402(a)(1) (2015).

When viewed in the light most favorable to the State, the evidence was sufficient for any rational trier of fact to find Defendant guilty beyond a reasonable doubt of aggravated robbery. Ms. Lee and Ms. Burns testified that both Defendant and the white male assailant were armed with guns. Mr. Webb testified that Defendant hit him in the face, held him down, and instructed his accomplice to take Mr. Webb's wallet. This testimony fully supports Defendant's conviction for aggravated robbery. Regarding Defendant's claim to police—that neither he nor his accomplice had a weapon and that his accomplice only used a BB gun—we note that the use of a BB gun would be

sufficient to support the guilty verdict because it is an "article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." *Id.* Moreover, Defendant's argument fails to recognize that he is criminally responsible for the actions of his accomplice. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2015). To be criminally responsible for the acts of another, a defendant must "in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)) (internal quotation marks omitted). By his own admission, Defendant participated in the burglary and robbery. Finally, Defendant's argument concerning inconsistencies in the jury's verdict is unpersuasive. Our supreme court has held that "[c]onsistency in verdicts for multiple count indictments is unnecessary" and that appellate courts will not speculate on the jury's reasoning in reaching its verdict. *Wiggins v. State*, 498 S.W.2d 92, 93-94 (Tenn. 1973); *see also State v. Davis*, 466 S.W.3d 49, 76 (Tenn. 2015). Defendant is not entitled to relief on this basis.

## B. Excessive sentence

Defendant additionally asserts that the trial court imposed an excessive sentence based on the misapplication of several enhancement factors. The State responds that the sentence lengths were appropriate because they were statutorily required.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2017), Sentencing Comm'n Cmts.

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the

administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210(b) (2017); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2017).

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2017).

### 1. Sentence length

Here, Defendant was convicted of aggravated robbery, a Class B felony, and aggravated burglary, a Class C felony, and the trial court determined that Defendant was a career offender based upon his prior criminal record. As noted by the State, Defendant does not challenge this finding on appeal, and he wholly disregards the fact that, because he is a career offender, the trial court was required by law to impose the maximum possible sentence for both convictions.

As relevant here, "[a] career offender is a defendant who has received . . . [a]ny combination of six (6) or more Class A, B or C prior felony convictions, and the defendant's conviction offense is a Class A, B or C felony[.]" Tenn. Code Ann. § 40-35-108(a)(1) (2017). A review of the record demonstrates that Defendant has nine previous convictions for aggravated robbery, a Class B felony, one previous felony conviction for an attempted first-degree murder, a Class A felony, and two previous felony convictions for especially aggravated kidnapping, a Class A felony. Accordingly, the trial court properly concluded that Defendant was a career offender. "A defendant who is found by the court beyond a reasonable doubt to be a career offender shall receive the maximum sentence within the applicable Range III." Tenn. Code Ann. § 40-35-108(c) (2017). The

maximum sentence for a Class B felony in Range III is thirty years. Tenn. Code Ann. § 40-35-112(c)(2) (2017). The maximum sentence for a Class C felony in Range III is fifteen years. Tenn. Code Ann. § 40-35-112(c)(3) (2017). The release eligibility for a defendant sentenced as a career offender "shall occur after service of sixty percent (60%) of the actual sentence imposed less sentence credits earned and retained by the defendant." Tenn. Code Ann. § 40-35-501(f) (2017). However, there is no release eligibility for a defendant committing aggravated robbery if the defendant has at least one prior conviction for aggravated robbery, and such a defendant "shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained." Tenn. Code Ann. § 40-35-501(k)(2) (2017). Therefore, the trial court properly sentenced Defendant, as a career offender, to thirty years' confinement with a hundred percent (100%) release eligibility for aggravated robbery and to fifteen years' confinement with a sixty percent (60%) release eligibility for aggravated burglary.

## 2. Consecutive sentencing

In his brief, Defendant does not specifically challenge the trial court's imposition of consecutive sentencing beyond arguing that his forty-five year sentence is "excessive." However, we will address the issue briefly. The Tennessee Supreme Court has expanded the standard of review in *Bise* to trial courts' decisions regarding consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705). However, when the trial court "fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority." *Pollard*, 432 S.W.3d at 863-64. In such situations, this court may "(1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." *Id.* at 864 (citing *Bise*, 380 S.W.3d at 705 & n.41).

Tennessee Code Annotated section 40-35-115 sets forth seven different situations in which a trial court may impose consecutive sentencing, including when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4); *see State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender, the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the

defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939.

Additionally, a trial court "may order sentences to run consecutively if the court finds by a preponderance of the evidence that . . . [t]he defendant is an offender whose record of criminal activity is extensive[.]" Tenn. Code Ann. § 40-35-115(b)(2) (2017). This factor has been interpreted "to apply to offenders who have an extensive history of criminal convictions and activities, not just to a consideration of the offenses before the sentencing court." *State v. Palmer*, 10 S.W.3d 638, 648 (Tenn. Crim. App. 1999). Additionally, "an extensive record of criminal activity may include criminal behavior which does not result in a conviction." *State v. Koffman*, 207 S.W.3d 309, 324 (Tenn. Crim. App. 2006) (quoting *State v. William L. Vaughn*, No. M2002-01879-CCA-R3-CD, 2003 WL 21877929, *5 (Tenn. Crim. App. Aug. 1, 2003), *perm. app. denied* (Tenn. Dec. 22, 2003)). Any one ground set out in the above statute is "a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* (citing Tenn. R. Crim. P. 32(c)(1)).

Before ordering consecutive sentencing, the trial court found that Defendant's record of criminal activity was extensive and that Defendant was a dangerous offender whose behavior indicated little or no regard for human life, and no hesitation about committing a crime in which the risk to human life was high. *See* Tenn. Code Ann. § 40-35-115(b)(2), (4). The trial court also made the additional findings required for the dangerous offender category under *Wilkerson*. Upon review, the trial court's findings are fully supported by the record. Defendant has an extensive history of repeatedly committing violent felonies, including ten convictions for aggravated robbery (including the instant offense), two convictions for especially aggravated kidnapping, and one conviction for attempted first-degree murder. Defendant is not entitled to relief on this issue.

### III. Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE